UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
                      Civil No. 12-3018(DSD/JJK)

Xuan Huynh,

      Plaintiff,

v.                                                          **ORDER**

United States Department
of Transportation,

      Defendant.


    Sellano L. Simmons, Esq., 700 Lumber Exchange Building, 10 South Fifth Street, Minneapolis, MN 55402; Stephen L. Smith, Esq., Law Firm of Stephen L. Smith, PLLC, 10 South Fifth Street, Suite 700, Minneapolis, MN 55402, counsel for plaintiff.

    Ana H. Voss, Assistant U.S. Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, counsel for defendant.


This matter is before the court upon the motion for summary judgment by defendant United States Department of Transportation (DOT). Based on a review of the file, record and proceedings herein, and for the following reasons, the court grants the motion.


**BACKGROUND**

This employment dispute arises out of the 2011 termination of plaintiff Xuan Huynh by DOT. At the time of his termination, Huynh was employed as an Air Traffic Control Specialist trainee at the Minneapolis Air Route Traffic Control Center (ARTCC) in Farmington, Minnesota. Voss Decl. Ex. 1, at FAA-00817.

Huynh's employment was contingent on "successful[] complet[ion of] air traffic controller training and obtain[ment of] facility ratings within uniformly applicable time limits." Id. Huynh was the only Asian-American in his training cohort of eight recruits. Compl. ¶ 6. The training program was detailed in the Air Traffic Technical Training Manual (Manual), which established procedures for the certification process. See Voss Decl. Ex. 5, at ROI-00230. Training included classroom- and computer-based activities, as well as on-the-job (OTJ) education. Id.

ARTCC was divided into six Areas, each of which was subdivided into five to seven Sectors. See Sullivan Dep. 8:3-13. Each Sector was typically divided into two Positions, a "data side" (D-side) and a "radar side" (R-side), and trainees were required to be certified at both Positions of each Sector in the Area to which they were assigned. Id. at 10:2-12. Trainees received up to 180 hours of training at each of the first two D-sides to which they were assigned, with an opportunity for additional training hours in special cases. See Santer Dep. 39:2-4. Supervisors measured the progress of trainees by conducting "skill checks." Id. at 30:1-2. Supervisors also had authority to suspend trainees' instruction, based on poor performance, prior to completion of 180 hours of training. See Sullivan Dep. 68:23-69:1; Voss Decl. Ex. 5, at ROI-

00233-ROI-00234. Suspensions were reviewed by a training review board (TRB), which recommended that training either be resumed or discontinued. See Voss Decl. Ex. 5, at ROI-00235-ROI-00236.

Huynh was assigned to Area 6. See Huynh Dep. 18:4-6. Trainees, including Huynh, worked with one supervisor and two on-the-job instructors (OTJIs). See Voss Decl. Ex. 5, at ROI-00229. Huynh was supervised by Greg Santer, and his initial OTJIs were Nancy Toren and Barbara O'Shea. See Santer Dep. 8:14-22; Huynh Dep. 20:25. Huynh alleges that Toren made negative comments to him concerning his dress and his insignificant role at ARTCC.[1] See Smith Aff. Ex. FF, at ¶¶ 14-15. On January 7, 2010, Huynh earned certification for the D-side of Section 27 in Area 6. See Compl. ¶ 8.

Huynh continued his training in Section 38. See Martenson Decl. ¶ 12. Huynh made initial progress but continued to receive criticism from trainers and supervisors. See, e.g., Voss Decl. Ex. 7-1, at FAA-00406. On March 15, 2010, Santer conducted a skill check and concluded that Huynh performed inadequately in numerous areas. See Santer Dep. 48:15-19. The following day, Huynh's training was suspended. Voss Decl. Ex. 7-2, at FAA-00465. At the time of suspension, Huynh had completed 85 hours of training on the D-side of Sector 38. See Vance Decl. ¶ 13. In April 2010, a TRB

---

[1] Huynh subsequently requested a new training team and was reassigned to OJTIs Brian Vance and Todd Martenson. See Vance Decl. ¶ 10; Martenson Decl. ¶ 4.

3

evaluated the suspension and a split panel recommended that Huynh be restored to the training program. See Voss Decl. Ex. 7-2, at FAA-00468. Thereafter, Huynh resumed training and received additional classroom instruction and training on maps, aircraft types and aircraft performance characteristics. See Smith Aff. Ex. FF, at ¶ 31.

During his employment, Huynh encountered several racially offensive comments. See id. at ¶¶ 38, 43. Specifically, Huynh overheard a coworker imitate an Asian accent in a derogatory manner and, on a separate occasion, another coworker referred to an Asian stereotype relating to fishing. See Smith Aff. Ex. FF, at ¶¶ 38, 43. Further, in early May 2010, during an Area 6 training session, Huynh found an employment application for McDonald's in his personal effects. Id. at ¶ 39.

On July 7, 2010, following another skill check by Santer, Huynh's training was again suspended. See Voss Decl. Ex. 7-4, at FAA-00676. On August 4, 2010, the TRB recommended that Huynh's training be discontinued. See id. Ex. 17, at FAA-00678.

Trainees who were unsuccessful in training or whose training had been suspended could seek reassignment to a different tower in two ways. First, the trainee could initiate an Employee Reassignment Request (ERR), in which a receiving facility could select employees for reassignment. See Nelson Dep. 29:16-22; 84:2-12. Huynh filed numerous ERRs, none of which resulted in a

transfer.  See Smith Aff. Ex. C.  Alternatively, in an "Article 61 job search," facility management submitted an evaluation to the Central Service Area (CSA), which would concur or disagree with the transfer recommendation provided therein.  See Nelson Dep. 25:16-26:3, 30:15-22.  Supervisors completed such evaluations on the basis of TRB recommendations.  See id. at 92:7-20.  ARTCC Air Traffic Manager Kelly Nelson completed an Article 61 evaluation of Huynh and recommended that he be terminated rather than proceed to an Article 61 job search.  See Voss Decl. Ex. 2.  The CSA concurred in the recommendation.  Id. at ROI-00187.  On December 9, 2010, Huynh was given an initial notice of proposed removal from FAA employment, and he received a final notice of removal on February 24, 2011.  Voss Decl. Exs. 3, 19.

On December 3, 2012, Huynh filed suit, alleging race discrimination under Title VII and the Minnesota Human Rights Act (MHRA).[2]  DOT moves for summary judgment.

**DISCUSSION**

**I.   Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

---

[2] Huynh waived his previously-asserted claim under 42 U.S.C. § 1981.  See Reply Mem. 1 n.1; see also Brown v. Gen. Servs. Admin., 425 U.S. 820, 828 (1976).  As a result, summary judgment on such claim is warranted.

5

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

**II.  Race Discrimination**

Huynh argues that DOT discriminated against him on the basis of his race. Specifically, Huynh argues that he was terminated in

violation of Title VII and the MHRA.[3]  Title VII and the MHRA[4] prohibit employers from "discharg[ing] any individual, or otherwise ... discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).

In the absence of direct evidence, race discrimination claims are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  A plaintiff must first establish a prima facie case of discrimination.  See Humphries v. Pulaski Cnty. Special Sch. Dist., 580 F.3d 688, 692 (8th Cir. 2009).  Upon such a showing, a defendant must articulate a legitimate, nondiscriminatory reason for its actions.  See id. at 692-93.  "If the employer makes such a showing, the plaintiff must then demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination."  Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006) (citation omitted).

---

[3] DOT argues that any MHRA claim is barred by the doctrine of sovereign immunity.  Because the court finds that the MHRA claim fails on the merits, it need not reach that argument.

[4] The court applies the same analysis to claims under the MHRA and Title VII when, as here, the claims depend on identical facts and theories.  See Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th Cir. 2005).

Here, even if Huynh could establish a prima facie case[5] of race discrimination, DOT has provided a legitimate, nondiscriminatory reason for his discharge: poor performance and lack of progress in the training program. An employer's burden of showing a legitimate, nondiscriminatory reason for termination is not onerous. Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 954 (8th Cir. 2012) (citation omitted), cert. denied, 133 S.Ct. 1252 (2013). DOT argues that its OJTIs and supervisors felt that Huynh lacked "the necessary judgment, awareness, and communication" needed to obtain certification in Sector 38. Martenson Decl. ¶ 9. Such concerns relating to an employee's failure to improve over time constitute legitimate, nondiscriminatory reasons for termination. See, e.g.,

---

[5] To establish a prima facie case of race discrimination, Huynh "must show that he (1) is within the protected class, (2) was qualified to perform the job, (3) suffered an adverse employment action, and (4) has facts that give rise to an inference of discrimination." Takele v. Mayo Clinic, 576 F.3d 834, 838 (8th Cir. 2009) (citation omitted). Huynh argues that, in addition to his termination, he suffered race discrimination by being unfairly denied a letter of recommendation and additional training hours. An employment action, however, is not adverse merely because it "makes an employee unhappy." Buboltz v. Residential Advantages, Inc., 523 F.3d 864, 868 (8th Cir. 2008) (citation and internal quotation marks omitted), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011). Rather, "[a]n adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." Spears v. Mo. Dep't of Corrs. & Human Resources, 210 F.3d 850, 853 (8th Cir. 2000) (citation omitted). In this case, neither failing to receive a requested letter of recommendation nor being denied additional training hours constituted an adverse employment action. See, e.g., Griffith v. City of Des Moines, 387 F.3d 733, 737 (8th Cir. 2004); Mackie v. U.S. Mfg., Inc., No. C03-85-LRR, 2005 WL 1532545, at *17 (N.D. Iowa June 29, 2005).

Bennis v. Minn. Hockey Ventures Grp., LP, No. 12-cv-341, 2013 WL 3305213, at *13 (D. Minn. June 28, 2013).

Thus, the burden shifts to Huynh to demonstrate that DOT's proffered explanation is pretextual, and that discrimination is the true reason for the adverse action. See Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1055 (8th Cir. 2007). "There are at least two ways [Huynh] may demonstrate a material question of fact regarding pretext." Guimaraes v. SuperValu, Inc., 674 F.3d 962, 975 (8th Cir. 2012) (citation and internal quotation marks omitted). "[Huynh] may show that [DOT's] explanation is unworthy of credence because it has no basis in fact,[6] or [he] may show pretext by persuading the court that discriminatory animus more likely motivated [DOT]." Id. (citation omitted). "Either route amounts to showing that a prohibited reason, rather than [DOT's] stated reason, actually motivated" his termination. Id. (citation and internal quotation marks omitted). Huynh argues that he can demonstrate pretext based on (1) workplace comments and behavior, (2) DOT's failure to follow its own policies and (3) DOT's treatment of similarly-situated white employees.

---

[6] Huynh argues that the use of subjective criteria in the evaluation process demonstrates that the DOT's explanation for his termination lacks credence. "Where the employer does not rely exclusively on subjective criteria, but also on objective criteria and education, the use of subjective considerations ... cannot in and of itself prove pretext or discriminatory intent." Torgerson v. City of Rochester, 643 F.3d 1031, 1049-50 (8th Cir. 2011) (citation omitted). As a result, such an argument is unavailing, and DOT's use of subjective criteria is not indicative of pretext.

9

### A.   Workplace Comments and Behavior

Huynh points to several examples that he argues reflect discriminatory animus by DOT, including the comments by Toren and the placement of the McDonald's employment application among his personal effects.  Workplace comments and behavior may potentially support a reasonable inference of pretext, so long as they do not require speculation.  See Takele v. Mayo Clinic, 576 F.3d 834, 839 (8th Cir. 2009).  The comments and behavior alleged here, however, in no way "suggest any reference to race" and cannot support a finding of pretext.  See Hannoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1047 (8th Cir. 2003).

Huynh also alleges that he encountered several other offensive comments during his employment with DOT.  Specifically, Huynh alleges that he overheard a coworker imitate an Asian accent in a derogatory manner and, on another occasion, that a coworker referred to an Asian stereotype relating to fishing.  See Smith Aff. Ex. FF, at ¶¶ 38, 43.  Huynh does not, however, identify the sources of such comments and does not argue that they were made by a decisionmaker. As a result, they are stray remarks and do not support an inference of pretext.  See Hitt v. Harsco Corp., 356 F.3d 920, 925 (8th Cir. 2004) (finding stray comments "are not persuasive evidence of motive when the remarks are made by persons other than a decisionmaker" (citation omitted)).

### B.   Failure to Follow Internal Policies

Huynh next argues that his initial suspension was in violation of DOT's internal policies. Specifically, Huynh argues that he was suspended prior to completion of the 180-hour maximum for the D-side of Sector 38 in violation of the Manual. "An employer's failure to follow its own policies may support an inference of pretext." Rahlf v. Mo-Tech Corp., Inc., 642 F.3d 633, 639 (8th Cir. 2011) (citation and internal quotation marks omitted). Here, however, the Manual did not prohibit suspension prior to completion of the maximum training hours. Indeed, a skill check could be "conducted prior to completing OJT Target hours ... if ... the minimum certification hours have been completed." See Voss Decl. Ex. 5, at ROI-00233. Moreover, failure of such a skill check could result in suspension. See id. At the time of his suspension, Huynh had completed 85 training hours at the D-side of Section 38, more than the 70-hour minimum required at that position. See id. Ex. 6, at ROI-00240. As a result, the DOT did not fail to follow its policies, and the suspension does not support an inference of pretext.

### C.   Disparate Treatment

Huynh argues that he was treated differently than his white co-trainees. Specifically, Huynh argues that similarly-situated white co-trainees suspended from training were able to transfer to other facilities pursuant to the Article 61 job search process. "Instances of disparate treatment can support a claim of pretext,

but [Huynh] has the burden of proving that he and the disparately treated whites were similarly situated in all relevant respects." Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994) (citations and internal quotation marks omitted).  At the pretext stage, the standard for satisfying such a burden is rigorous. See Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 853 (8th Cir. 2005), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011).  "To be similarly situated, the comparable employees must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct *without any mitigating or distinguishing circumstances*." Tolen v. Ashcroft, 377 F.3d 879, 882 (8th Cir. 2004) (emphasis added) (citations and internal quotation marks omitted).  Huynh can demonstrate that he is similarly situated to white co-trainees "by comparing [his] characteristics, such as job position and duties, employment history and the nature of the employment action giving rise to the lawsuit, with that of the identified co-employees." Naylor v. Ga.-Pac. Corp., 875 F. Supp. 564, 577 (N.D. Iowa 1995) (citations omitted).

Here, Huynh has not established that he and the identified white co-trainees - M.B., J.D., N.F., A.K., A.R., C.S., M.T. and M.W. - were similarly situated in all relevant aspects.  Indeed, A.R. and C.S. are not proper comparators, as they transferred via the ERR process rather than an Article 61 job search.  See Smith

Aff. Ex. L. As already explained, the ERR process relies on selections by the receiving facility and ARTCC employees have no control over such decisions. See Nelson Dep. 29:16-25. Moreover, J.D. and M.T. worked in a different Area, A.R. had greater experience and N.F. trained under different OJTIs. See Voss Decl. Exs. 12, 22, at 9, 25-26; Santer Dep. 30:17-18; Smith Aff. Ex. P. Further, the TRB memorandum for M.B. described M.B. as an individual with a "strong work ethic" who "worked hard and constantly took notes to improve his knowledge." Smith Aff. Ex. M. By contrast, the TRB's final consideration of Huynh featured no such complimentary language and instead listed his various deficiencies in concluding that continued training was not warranted. See Voss Decl. Ex. 17, at FAA-00678. As a result, M.B. and Huynh are not similarly situated because of these distinguishing circumstances. As to the remaining co-trainees - A.K. and M.W. - Huynh adduces insufficient evidence from which the court can determine whether such individuals were similarly situated in all relevant respects. See Williams v. Ford Motor Co., 14 F.3d 1305, 1309 (8th Cir. 1994).

In light of "strong evidence of noncomparability," Huyhn has failed to satisfy his burden to demonstrate that he and the identified trainees were similarly-situated. Jones v. Frank, 973 F.2d 673, 676 (8th Cir. 1992). Thus, any different treatment of

them is not indicative of pretext.  As a result, Huynh has not raised a material fact issue as to whether DOT discriminated against him because of his race, and summary judgment is warranted.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that the motion for summary judgment [ECF No. 17] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 20, 2014

s/David S. Doty
David S. Doty, Judge
United States District Court
